UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ROBERT WARD GARRISON, ) <br> ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> DOUGLAS WADDINGTON, ) <br> ) <br> Respondent. ) <br> _____ ) | CASE NO.   C06-459-TSZ-MJB <br><br> REPORT AND <br> RECOMMENDATION |

## I. INTRODUCTION AND SUMMARY CONCLUSION

Petitioner Robert Ward Garrison is a state prisoner currently incarcerated at the Washington State Penitentiary in Walla Walla, Washington. He seeks relief under 28 U.S.C. § 2254 from his December 1998 conviction for solicitation to commit first degree murder. After careful consideration of the record in its entirety, the Court concludes that no evidentiary hearing is required and recommends that Petitioner's federal habeas petition should be DENIED and this action dismissed with prejudice.

## II. FACTUAL AND PROCEDURAL HISTORY

A.   BACKGROUND FACTS

In an unpublished opinion issued on November 6, 2000, the Washington Court of Appeals summarized the facts related to Petitioner's conviction as follows:

REPORT AND RECOMMENDATION
Page - 1

Garrison and Farrah Dawn Soar became romantically involved in June 1996. When the relationship fell apart after about one year, Soar began a romantic relationship with one of Garrison's friends, David Windhausen. Garrison continued to pursue Soar, and was charged with misdemeanor stalking and booked into the King County Corrections Center in December 1997. Bail was set at $100,000 because Garrison refused to sign a no contact order.

While in custody, Garrison met Robert Hull, another inmate, who testified at trial that Garrison was upset about a failed deal he had made to have Windhausen killed. According to Hull, Garrison told him that another inmate, Anthony Roessler, had promised Garrison he would kill Windhausen within three days of his release from custody if Garrison gave him $1,100 or $1,200 to post bond. Roessler had not followed through.[1] Hull explained that after he jokingly told Garrison he would make sure Windhausen was killed "for a lot less," Garrison "would not let up" and pestered Hull about killing Windhausen. According to Hull, he and Garrison eventually struck a deal that Garrison would bail Hull out of jail if Hull would either kill Windhausen or get someone else to do it. Hull said that during their discussions, Garrison drew four maps for him.[2] One showed where Windhausen lived and worked and what his work schedule was, and another showed a tavern that Windhausen frequented after work and the route he normally took home.

Garrison's version of these events differed from Hull's. Garrison testified that he gave bail money to Hull just "to get rid of him" and so that Hull could do some errands for him. He said he asked Hull to contact his place of employment and ask someone there to check on his truck, which was parked at the hotel where Garrison was living when he was arrested. Garrison also wanted Hull to purchase a winter coat from him and put it in his jail property, and to contact Soar and tell her that he did not blame her for his incarceration.[3] He explained that he expected to be reimbursed for $210 of the $300 he loaned to Hull as long as Hull showed up for his court date.[4]

---

[1] Other testimony at trial confirmed that $1,200 was transferred from Garrison's to Roessler's jail account and Roessler used that money to bail out. Garrison admitted he bailed Roessler out for $1,200 and did not expect to be paid back, but denied that he asked Roessler to kill Windhausen.

[2] These maps were exhibits at trial.

[3] One of the maps that Garrison drew for Hull gave the name of a friend who Garrison hoped Hull would contact to relay a message to Soar.

[4] Garrison stated that the other $90 was required for bond company fees.

REPORT AND RECOMMENDATION
Page - 2

On January 27, 1997, Hull bailed out of jail using $300 he received from Garrison's jail account and contacted the Seattle Police Department because he "didn't want [Windhausen] killed over this." After Hull told his story to the police, undercover Detective Richard O'Donnell went with Hull to see Garrison in jail. According to O'Donnell, Hull introduced him as a member of a motorcycle gang who could be trusted and implied that O'Donnell would fulfill the deal between Hull and Garrison. O'Donnell then showed Garrison two pictures of Windhausen and asked him "if this was the guy" and Garrison answered yes. O'Donnell then asked Garrison, "Do you just want his guy fucked up?" According to O'Donnell, Garrison responded, "No, I don't want him ever to see daylight again."

O'Donnell told Garrison he would contact Windhausen and feign interest in buying a boat Windhausen had for sale. They would meet and have a few beers, then O'Donnell would "do him." O'Donnell testified that Garrison said he didn't mind if Soar was present when Windhausen was killed, but that he did not want Soar hurt. According to O'Donnell, Garrison asked him how much he wanted, and O'Donnell said $2,500. Garrison agreed and said he would pay O'Donnell when his next few paychecks became available. O'Donnell also asked Garrison to pay for a bus ticket so he could leave town after Windhausen was killed. As a down payment for the deal, Garrison released $60 of the remaining $68 in his property account to O'Donnell the same day.

Garrison's trial testimony was contrary to O'Donnell's as well. He said he was suspicious of O'Donnell and thought he was a cop because O'Donnell wasn't dressed like a typical biker and "[h]is fingernails were clean and well trimmed, no grease under his fingernails or nothing." Garrison also said that as the conversation progressed, he began to suspect O'Donnell was friend of Windhausen's because the pictures of Windhausen that O'Donnell showed him were taken in very close range, and because O'Donnell said things about Windhausen that only a close friend would know. Garrison admitted he had a conversation with O'Donnell about exchanging money for killing Windhausen, but explained that he went along with it because he had figured out that O'Donnell knew Windhausen and he wanted to unsettle Windhausen. Garrison figured that O'Donnell would scare Windhausen by being "the little messenger boy" and telling Windhausen that Garrison was still upset with him about his relationship with Soar.

(Ex. 2 at 2-5.[5])

---

[5] Each Exhibit ("Ex.") cited in this section is found in Dkt. #49, which consists of relevant portions of the state court record.

REPORT AND RECOMMENDATION
Page - 3

B.     PROCEDURAL HISTORY

On December 17, 1998, Petitioner was found guilty by jury verdict of solicitation to commit murder in the first degree. (Ex. 1.) On April 20, 1999, he was sentenced to 180 months of imprisonment. (Ex. 1 at 3.) On May 20, 1999, Petitioner's trial counsel filed a notice of appeal. (Ex. 7.) Thereafter, his appellate counsel appealed Petitioner's conviction to the Washington Court of Appeals ("Court of Appeals"), claiming error by the trial court in admitting firearm evidence to show intent and ineffective assistance of counsel. (Ex. 2 at 1.)

On June 8, 1999, Petitioner filed the following *pro se* pleadings in King County Superior Court regarding his trial and sentencing: Motion for Discretionary Review by the Washington Supreme Court, Motion for Accelerated Review of Superior Court's Jurisdiction, Notice for Discretionary Review, and Statement of Grounds for Direct Review by the Supreme Court. (Ex. 3.) He also submitted these pleadings to the Washington Supreme Court, which rejected them for filing and informed Petitioner that his Notice for Discretionary Review was superceded by the Notice of Appeal filed by his counsel in the Court of Appeals on May 20, 1999. (Ex. 4.)

On June 17, 1999, Petitioner filed in the state supreme court a Motion for Fact Finding in Mater [sic] of Whos [sic] Appel [sic] was First. (Ex. 5.) Noting that the Petitioner's case was already opened in the Court of Appeals and that he was represented by counsel, the Supreme Court forwarded the motion to the Court of Appeals for determination. (Ex. 6.) On June 30, 1999, Court of Appeals entered a notation ruling by Commissioner regarding Petitioner's motion for discretionary review, indicating that because the matter had been opened as an appeal pursuant to the notice of appeal filed by Petitioner's counsel, and because petitioner had been appointed counsel

REPORT AND RECOMMENDATION
Page - 4

on appeal, no motion for discretionary review was required and the *pro se* motion was being placed in the file without action. (Ex. 8.) The Commissioner also ruled that Petitioner's pro se motion for accelerated review was premature and the motion for finding of fact was unnecessary because the appeal was properly before the court. (*Id.*)

Subsequently, from July 1999 through April 2000, Petitioner filed a number of challenges to the Court of Appeals Commissioner's ruling, as well as to subsequent rulings by the state Supreme Court Commissioner, which the courts respectively denied.[6] On November, 6, 2000, the Court of Appeals issued an unpublished opinion affirming Petitioner's conviction. (Ex. 2.) Again, from January 2001 through December 2001, Petitioner filed motions for discovery, motions for reconsideration, and motions for extension of time to seek discretionary review in either the Court of Appeals or the Supreme Court, all of which were denied.[7] The Supreme Court issued an order denying Petitioner's motion to modify the Commissioner's ruling on February 5, 2002. (Ex. 32.) The Court of Appeals issued its mandate on February 28, 2002. (Ex. 33.)

In June 2002, Petitioner filed a federal habeas petition pursuant to 28 U.S.C. § 2254 in this Court. (Ex. 34.) This Court denied the petition for failure to exhaust state court remedies and dismissed the action without prejudice. (Ex. 38.) On September 23, 2003, the Ninth Circuit Court of Appeals denied Petitioner's request for a certificate of appealability. (Ex. 40.)

---

[6]An accurate summary of Petitioner's pro se motions and the courts' rulings is set out at pages 4-5 of Respondent's Answer. (*See* Dkt. 47.)

[7]This set of Petitioner's motions is likewise accurately described in Respondent's Answer. (*Id.* at 6-7.)

REPORT AND RECOMMENDATION
Page - 5

On August 11, 2004, Petitioner mailed a motion to the King County Superior Court requesting initial consideration of a motion to vacate judgment that was mailed to the Court on May 18, 1999. (Ex. 41.) The superior court had apparently received the motion to vacate judgment, but concluded that because the case was currently being appealed, the Court of Appeals had jurisdiction. (Ex. 41, Attachment 6, Letter dated August 9, 1999.) On August 25, 2005, the superior court transferred Petitioner's motion for relief from judgment to the Court of Appeals (Ex. 42), which treated the motion as a personal restraint petition ("PRP"). On September 29, 2004, the Court of Appeals dismissed the PRP under RAP 16.11(b), concluding that Petitioner failed to state grounds upon which relief could be granted by way of PRP. (Ex. 43.)

Petitioner subsequently filed several motions in the state supreme court, including a motion for extension of time to file for discretionary review. (Ex. 45). The Supreme Court granted the motion for extension of time in part. (Ex. 48.) On December 28, 2004, the Supreme Court Commissioner denied Petitioner's motion for discretionary review, which argued that the trial court erred in failing to hold a CrR 3.5 hearing to determine the admissibility of out-of-court statements Petitioner made. (Ex. 52.) Petitioner's motion to modify the Commissioner's ruling was denied on March 29, 2005. (Ex. 54). The Court of Appeals issued its certificate of finality on May 17, 2005. (Ex. 55).

Petitioner filed his current federal habeas petition on April 17, 2006. (Dkt. # 13.) After twice being granted extensions of time by the Court, Respondent filed a response to the petition, along with relevant portions of the state court record. (Dkt. # 49, 50.) Petitioner requested and was granted two extensions of time in which to file a reply. (Dkt. #52, 58.) However, to date, Petitioner has not filed a reply. On January 18 and

REPORT AND RECOMMENDATION
Page - 6

19, 2007, respectively, Petitioner filed a Motion for Order to Enter Riverview Marina to Take Video Footage on January 31, 2007 (Dkt. #62), and a Motion to Cause the Washington State Department of Corrections to Provide Resources Needed by Petitioner to Reply to Respondent's Answer (Dkt. #63).

### III.  GROUNDS FOR RELIEF

Petitioner sets forth the following two grounds for relief in his federal habeas petition:

> A.  <u>Ground one</u>: That I am actually innocent, that I was framed by State/counsel conspiracy to convict me.
>
> B.  <u>Ground two</u>: The State failed to prove Garrison's visit statements to be voluntary/free of constitutional violation.

### IV.  STANDARD OF REVIEW

A habeas corpus petition shall not be granted with respect to any claim adjudicated on the merits in the state courts unless the adjudication either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts.  28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the U.S. Supreme Court on a question of law, or if the state court decides a case differently than the U.S. Supreme Court has on a set of materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from

the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.* at 413.

In *Lockyer v. Andrade*, 528 U.S. 63 (2003), the Supreme Court examined the meaning of the phrase "unreasonable application of law" and corrected an earlier interpretation by the Ninth Circuit which had equated the term with the phrase "clear error." The Court explained:

> These two standards, however, are not the same. *The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness. It is not enough that a federal habeas court, in its "independent review of the legal question" is left with a "firm conviction" that the state court was "erroneous."* . . . [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable.

*Id.* at 75-76 (emphasis added) (citations omitted).

Additionally, if a habeas petitioner challenges the determination of a factual issue by a state court, such determination is presumed correct, and the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## V.  DISCUSSION

A.  UNEXHAUSTED CLAIM

Respondent concedes that Petitioner fully and fairly exhausted his second ground for habeas relief on a federal constitutional basis in his PRP to the Washington Supreme Court. However, Respondent argues that Petitioner's first ground for federal habeas relief is unexhausted because he never presented that claim to the Washington Court of Appeals or the Washington Supreme Court.

REPORT AND RECOMMENDATION
Page - 8

1. Exhaustion

Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (internal quotation marks and citations omitted). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. *Id.* (citing *Duncan v. Henry*, 513 U.S. 364, 365-66, 115 S.Ct. 887, 130 L.Ed.2d (1995)); *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

Here, as argued by Respondent, Petitioner acknowledges in his § 2254 petition that he did not present his ground one claim of actual innocence either on direct appeal or in post conviction proceedings. (Dkt. #13 at 5.) Accordingly, this Court concludes that Petitioner failed to properly exhaust ground one because he failed to "fairly present" it to the state supreme court.

2. Procedural Bar

Respondent also argues that Petitioner is now barred from presenting his ground one claim in a future personal restraint petition to the Washington courts under the independent and adequate state procedural bar of RCW 10.73.090. (Dkt. #47 at 18). If an unexhausted claim is now barred by a mandatory rule of state procedure, the exhaustion requirement is satisfied, but the claim is procedurally barred. *See Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

REPORT AND RECOMMENDATION
Page - 9

Under Washington law, collateral attacks on a judgment and sentence must be filed within one year after the judgment becomes final. Wash. Rev. Code § 10.73.090(1). The statute further provides that a judgment becomes final on the last of several dates, which include the date that an appellate court issues its mandate disposing of a timely direct appeal from the conviction. *Id.* § 10.73.090(3)(b).

In this case, the Court of Appeals' mandate on Petitioner's direct appeal was issued February 28, 2002. (Dkt. #49, Ex. 33.) Accordingly, because more than one year has passed since that date, Petitioner is now procedurally barred under section 10.70.090 from returning to state court to seek relief on his ground one claim of actual innocence.

A petitioner who has committed procedural default may excuse the default and obtain federal review of his constitutional claims only by showing cause and prejudice, or by demonstrating that the failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Cause may be demonstrated by showing that "some objective factor external to the defense" prevented the petitioner from complying with state procedural rules relating to presentation of his or her claims. *See e.g., McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991). Once petitioner has demonstrated cause, he or she must show actual prejudice resulting from the failure to comply. To show "prejudice," the petitioner "must shoulder the burden of showing not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). Only in an "extraordinary case" may the habeas court grant the writ without a showing of cause or prejudice to correct a "fundamental miscarriage of justice" where

a constitutional violation has resulted in the conviction of a defendant who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).

Petitioner asserts in his habeas petition that he did not exhaust ground one because "[m]y exhibits were destroyed by DOC [Department of Corrections] on July 07, '02; my earlier efforts to raise these facts were met with further distruction [sic] and tampering of trial evidence after the facts were presented to counsel." (Dkt. #13 at 5). Petitioner further asserts that he did not raise the ground one claim in collateral proceedings because he "did not have exhibits to prove ground then, and the state would have change[d] exhibits had I done so." (*Id.* at 11, question 13(a).)

The Court finds that Petitioner has neither shown cause and prejudice, nor demonstrated a fundamental miscarriage of justice, such as would sufficiently excuse his procedural default. Although Petitioner provides some support for his claim that DOC destroyed his exhibits in July 2002,[8] he fails to adequately explain why he raised no collateral attack to his conviction during the four month period from March through June 2002, after the Court of Appeals issued its mandate and before the exhibits were destroyed. In fact, Petitioner admits that there were copies of the destroyed discovery documents at his mother's, even though he contends "she doesn't know one from the other," "cannot afford to copy it all and mail it to me," and "none of it was separated into identifiable files." (Dkt. #13 at 18.) Moreover, Petitioner's allegations of conspiracy between his trial counsel and the prosecution, and of evidence tampering are speculative, which he acknowledges in his habeas petition. (Dkt. # 13 at 31, stating

---

[8]Petitioner submitted copies of correspondence he received from DOC in October and December 2002, explaining DOC's position regarding misplaced/destroyed legal photocopies and that it was prepared to have Petitioner request the originals from the courts at DOC's expense and prison staff would make copies of them when they arrived. (Dkt. #2 at Ex. 1.)

REPORT AND RECOMMENDATION
Page - 11

"Garrison can only speculate as to how all these persons in these many different state agencies could so easily come together to deny someone they don't even know, the basic right to a fair trial.")  Accordingly, the undersigned concludes that Petitioner has failed to demonstrate that his ground one claim is eligible for federal habeas review.

B.    STATUTE OF LIMITATIONS

Respondent argues that Petitioner's federal habeas petition is time-barred under 28 U.S.C. § 2244(d).  (Dkt. 47 at 21.)   This Court concurs.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year statute of limitations on habeas corpus petitions filed by state prisoners in federal court.  28 U.S.C. § 2244(d)(1).  Specifically, it provides that the one-year limitations period "shall run from the latest of – (A) the date on which the judgment became final by conclusion of direct review or by the expiration of time for seeking such review.  28 U.S.C. § 2244(d)(1)(A).

Thus, under the statute, a judgment becomes "final" in one of two ways – either by the conclusion of direct review by the highest court, including the United States Supreme Court, to review the judgment, or by expiration of the time to seek such review, again from the highest court from which such direct review can be sought.  *Wixom v. Washington*, 264 F.3d 894, 897 (9th Cir. 2001); *cf. Bowen v. Rowe*, 188 F.3d 1157, 1158-59 (9th Cir. 1999) ("We hold that the period of direct review includes the period within which a petitioner can file a petition for writ of certiorari from the United States Supreme Court, whether or not the petitioner actually files such a petition.").

In the present case, because the Washington Court of Appeals affirmed Petitioner's conviction in an unpublished opinion on November 6, 2000 (Dkt. #2), and Petitioner did not seek review by the Washington Supreme Court, the court of appeals'

decision marked the "conclusion of direct review." *See Wixom*, 264 F.3d at 898. However, because Petitioner could have sought review by the state supreme court, the AEDPA limitations period did not start until his time to seek such review expired, which was within 30 days after the decision was filed. *Id.;* Wash. RAP 13.4(a). Accordingly, in light of these facts, the judgment became final on December 6, 2000. Counting forward one year from this date, Petitioner had until December 6, 2001, to file his federal habeas petition.

In addition to identifying the date marking conclusion of direct review on the appeal filed by Petitioner's appellate counsel, Respondent also noted the date marking conclusion of direct review on the various pro se motions that Petitioner filed while his direct appeal was pending. Petitioner's pro se motions were denied by Commissioner's rulings in the state appellate courts, with the state supreme court's issuing a final order denying Petitioner's motion to modify the Commissioner's ruling on February 5, 2002. (Dkt. #49, Ex. 32.) Although Petitioner did not do so, he then had 90 days after entry of that order to file a petition for writ of certiorari in the United States Supreme Court. Sup. Ct. R. 13(1). Accordingly, the date marking conclusion of direct review on Petitioner's *pro se* motions was May 5, 2002. Counting forward one year from this date, Petitioner would have had until May 5, 2003 to file his federal habeas petition.

Using either December 6, 2000, or May 5, 2002, as the date which the judgment became final on direct review, Petitioner's current federal habeas that was filed on April 7, 2006, would be untimely under the one-year AEDPA limitations period unless the statute of limitations was statutorily or equitably tolled.

1.      Statutory Tolling

The AEDPA further provides that the one-year statute of limitations is tolled for

REPORT AND RECOMMENDATION
Page - 13

"[t]he time during which a properly filed application for State post-conviction or collateral review . . . is pending." 28 U.S.C. 2244(d)(2). Here, however, Petitioner's motion for initial consideration of his motion to vacate judgment, which was transferred to the Court of Appeals and treated as a PRP, was mailed to the trial court on August 11, 2004. (Dkt. #49, Ex. 41.) To the extent that August 11, 2004, is considered the filing date under the prison mailbox rule,[9] Petitioner's PRP was still filed well beyond AEDPA's one-year limitations period under either of the final judgment dates discussed above.

### 2. Equitable Tolling

The federal habeas corpus statute of limitations is also subject to equitable tolling. *Calderon v. United States Dist. Ct. (Beeler)*, 128 F.3d 1283, 1288 (9th Cir. 1997), *overruled in part on other grounds by Calderon v. United States Dist. Ct. (Kelly)*, 163 F.3d 530, 540 (9th Cir. 1998) (en banc). However, the Ninth Circuit has made clear that "[e]quitable tolling will not be available in most cases, as extensions of time will only be granted if 'extraordinary circumstances' beyond a prisoner's control make it impossible to file a petition on time." *Calderon*, 128 F.2d at 1288 (citing *Alvarez-Machain v. United States*, 107 F.3d 696, 701 (9th Cir. 1997)). The Ninth Circuit further explained in *Miles v. Prunty*, 187 F.3d 1104, 1107 (9th Cir. 1999), that "[w]hen external forces, rather than a petitioner's lack of diligence, account for failure to timely file a claim, equitable tolling of the statute of limitations may be appropriate." In the present case, Petitioner

---

[9]Federal and state habeas petitions are deemed filed when the *pro se* prisoner delivers them to prison authorities for forwarding to the Clerk of the Court. *See Saffold v. Newland*, 250 F.3d 1262, 1268 (9th Cir. 2001), *overruled on other grounds by Carey v. Saffold*, 536 U.S. 214, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002).

REPORT AND RECOMMENDATION
Page - 14

makes no showing that he is entitled to equitable tolling with respect to his federal habeas challenge to his state court conviction.

Because Petitioner filed his federal habeas petition outside the statute of limitations period and because he has not demonstrated that he is entitled to equitable tolling of the statute of limitations, his petition should be dismissed as time-barred.

C.  OTHER PENDING MOTIONS

Subsequent to the filing of Respondent's Answer, Petitioner filed a Motion for Order to Enter Riverview Marina to Take Video Footage on January 31, 2007 (Dkt. #62), and a Motion to Cause the Washington State Department of Corrections to Provide Resources Needed by Petitioner to Reply to Respondent's Answer (Dkt. #63). In light of the this Court's conclusion that Petitioner's federal habeas petition is time-barred, Petitioner's pending motions are stricken as moot.

## VI.  CONCLUSION

For the reasons set forth above, this Court recommends that Petitioner's federal habeas petition be denied, and that this action be dismissed with prejudice. It is further recommended that Petitioner's other pending motions be stricken as moot. A proposed Order accompanies this Report and Recommendation.

DATED this 6th day of February, 2007.

*[signature]*

MONICA J. BENTON
United States Magistrate Judge